In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 22-2621

G.G. and DEANNA ROSE,

*Plaintiffs-Appellants*,

*v.*

SALESFORCE.COM, INC.,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cv-02335 — **Andrea R. Wood**, *Judge*.

———————————

ARGUED FEBRUARY 22, 2023 — DECIDED AUGUST 3, 2023

———————————

Before HAMILTON, KIRSCH, and PRYOR, *Circuit Judges*.

HAMILTON, *Circuit Judge*. In the Trafficking Victims Protection Reauthorization Act of 2003, Congress gave victims of sex trafficking the power to bring civil actions to recover damages from those who trafficked them. 18 U.S.C. § 1595 (2003). In 2008, Congress broadened that civil remedy to allow what we will call participant liability. The amendment allows victims to recover damages not only from a trafficker who committed a federal crime but also from a person who "knowingly

benefits … from participation in a venture which that person knew or should have known has engaged in an act" of sex trafficking. 18 U.S.C. § 1595(a) (2008).

Plaintiffs G.G. and her mother Deanna Rose brought this suit under Section 1595 alleging participant liability against defendant Salesforce.com, Inc. G.G. ran away from home at the age of thirteen. She fell into the hands of a sex trafficker who used the now defunct Backpage.com to advertise G.G. Plaintiffs' theory here is that (a) Backpage.com committed criminal sex-trafficking violations with respect to G.G., among many other victims; (b) defendant Salesforce at least should have known that Backpage.com was engaged in sex trafficking of minors like G.G.; and (c) Salesforce had such a close business relationship with Backpage—providing advice and custom-tailored software for years to help Backpage grow its business—that Salesforce, in the language of Section 1595, knowingly benefited from its participation in what it knew or should have known was Backpage's sex-trafficking venture.

The district court dismissed the case on the pleadings, but we conclude that plaintiffs' complaint states a viable claim under Section 1595. More specifically, we reject defendant's arguments: (1) that a "venture" must be primarily a *sex-traf-ficking* venture; (2) that a participant must have had constructive knowledge of the *specific* victim of sex trafficking, the civil plaintiff; (3) that "participation in a venture" requires direct participation in a "common undertaking or enterprise involv-ing risk and potential profit"; and (4) that to knowingly bene-fit requires that the sex trafficker provide the participant with a benefit because of the participant's facilitation of a sex-traf-ficking venture and that the participant must have known that

this was the reason for the benefit. All of these defense theories seek to impose restrictions on the civil remedy that are not consistent with the statute as we understand its language. We also find that Salesforce is not entitled to dismissal under Section 230 of the Communications Decency Act, 47 U.S.C. § 230. We reverse the judgment of the district court and remand for further proceedings.

I.   *Factual Background & Procedural History*

Defendant Salesforce.com moved to dismiss this case on the pleadings, so we focus on the facts alleged in plaintiffs' third amended, and operative, complaint. This opinion says harsh things about Salesforce contributing to sex-trafficking, including trafficking of minors. Because of Salesforce's tactical choice to move to dismiss, we treat the allegations as true, though we do not vouch for their objective truth at this point in the case. See, e.g., *Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

In 2016, when she was just thirteen years old, plaintiff G.G. ran away from home.  She was picked up by a sex trafficker who advertised her on Backpage.com, an online marketplace, and repeatedly sold her into prostitution. G.G.'s mother searched for her daughter. Eventually, in the summer of 2016, her mother found photos of G.G.—in Backpage's online ads for escorts. Backpage referred her mother to the National Center for Missing and Exploited Children but did not take down the advertisement.

The trafficking and advertising of G.G. on Backpage was not an isolated or even an unusual incident. When Backpage was created in 2004, it initially served as a marketplace for a variety of goods and services. By 2008, however, plaintiffs

allege, Backpage "had been publicly identified by law en-forcement, United States Attorneys General, and every state Governor as the biggest and most notorious sex trafficking and pimping website in the United States."

Backpage's sextrafficking was not limited to adults. During the three years prior to G.G.'s trafficking, Backpage generated more than 99% of its revenue from "adult advertisements," including those offering minors for sex. In 2010, the National Association of Attorneys General publicly described Backpage as a "hub" of human trafficking, "especially the trafficking of minors." In October 2016, just a few months after her mother found the advertisement for G.G. on Backpage, California authorities arrested and charged the chief executive officer of Backpage, Carl Ferrer, for pimping minors. In April 2018, Ferrer and Backpage entered into plea agreements with the United States Department of Justice in which they admitted that Backpage had operated as a site for the sale of sex since 2004. A few days later, in response to a felony charge and on the advice of counsel, Backpage confessed in a Texas court that it "knowingly receive[d] a benefit from participating in a venture that involved the trafficking … of a child younger than 18 years of age, and … [had] caused [the child] to engage in or become the victim of conduct prohibited by" Texas Penal Code Section 43.05 ("Compelling Prostitution").[1] The United States Department of Justice seized Backpage and shut it down.

---

[1] See Judicial Confession and Stipulation and Certification of Discovery, *Texas v. Backpage.com*, No. 18FC-1653C (Tex. Dist. Ct. Apr. 9, 2018), available at https://digitalcommons.law.scu.edu/historical/1706/.

According to plaintiffs, Salesforce "entered into the first of several lucrative contracts with Backpage" back in 2013, years after the nature of Backpage's business was widely known, and about three years before G.G. was trafficked. The contracts with Salesforce were designed to "facilitate and support" Backpage's "exponential growth" and to give Backpage "the ability to keep pace with increasing customer demand and scale its platform into an international sex-trafficking hub."

Salesforce did not merely sell Backpage an off-the-shelf software package. It instead sold Backpage software designed specifically for Backpage and provided affirmative, "personalized support." With those products and support, Salesforce helped Backpage operate its business, manage relationships with existing customers, market itself to new customers, and improve profitability. "Salesforce sold Backpage targeted solutions addressed to the needs of Backpage's business" and provided "active, ongoing support" that was "tailored" to Backpage's needs.

Toward that end, at least five times between November 2013 and April 2017, Salesforce consulted with Backpage, including its CEO, to learn about the business and "to assess its operational needs." With Salesforce's help in the form of new software, marketing technology, and personalized operational support, Backpage was able to "collect detailed, in-depth customer data and use the data to streamline communications and overall business practices." When Backpage faced imminent seizure by the United States government and wanted to "establish and maintain a duplicate copy of the Backpage operations system and platform" so that it could "move and operate its business overseas," Salesforce

"facilitated this system reorganization and provided the technical infrastructure" to do so.

In short, plaintiffs allege, the business relationship between Backpage and Salesforce was successful. It enabled Backpage "to scale its operations and increase the trafficking conducted" through its site. With Salesforce's help, Backpage grew "to become the dominant force in online sex trafficking." Backpage experienced "unprecedented growth" in both its business and profits and was transformed from a "small … company with a handful of employees to an international powerhouse with over 250 employees spanning three continents." From the beginning of 2008 through the end of 2010, Backpage's gross revenues totaled $46 million. In 2012 alone, Backpage's gross revenue was $71 million. And from January 2013 through May 2015, Backpage's gross revenue climbed to approximately $346 million, nearly $340 million of which was generated from adult advertising.[2] As Backpage's business expanded and its profits grew, "the scope of work covered by the Salesforce contracts," as well as Salesforce's profits from those contracts, also grew. Salesforce stopped doing business with Backpage only when it was shut down by the federal government in April 2018.

Two years later, in April 2020, G.G. and her mother filed this lawsuit in federal court seeking to hold Salesforce liable

---

[2] The allegations in the complaint do not specify what portion of Backpage's gross revenues were generated through the trafficking of minors, but at this stage of the litigation, we may infer in plaintiffs' favor that the trafficking of minors constituted a significant source of revenue, particularly in light of the allegation that Backpage had been deemed a "hub" of "human trafficking, *especially the trafficking of minors*" by the National Association of Attorneys General.

under Section 1595, as well as state common law theories, for the trafficking of G.G. In October 2021, plaintiffs filed their third amended complaint, correcting for various deficiencies, abandoning the state-law claims, and adding Backpage as a defendant. In short order, Salesforce moved to dismiss plaintiffs' complaint for failure to state a claim.

After plaintiffs voluntarily dismissed defendant Backpage in February 2022, the district court granted Salesforce's motion to dismiss. *G.G. v. Salesforce.com, Inc.,* 603 F. Supp. 3d 626, 630 (N.D. Ill. 2022). The district court reasoned first that plaintiffs had pled themselves out of court by alleging facts that showed Salesforce was entitled to the protection of 47 U.S.C. § 230. *Id.* at 633, 637, 639. Alternatively, the district court found that plaintiffs had failed to allege a plausible claim under 18 U.S.C. § 1595. *Id.* at 643. Plaintiffs moved to alter or amend the judgment under Rule 59(e), and the district court denied the motion. Plaintiffs then appealed.

## II. *Analysis*

### A. *Legal Standard*

We review de novo both a district court's legal conclusions and its dismissal of a complaint for failure to state a claim under Rule 12(b)(6). *Wirth v. RLJ Dental, S.C.*, 59 F.4th 270, 272 (7th Cir. 2023) (legal conclusions); *Proft v. Raoul*, 944 F.3d 686, 690 (7th Cir. 2019) (dismissal). We treat the complaint's factual allegations as true and draw factual inferences in the plaintiffs' favor. *Boogaard v. Nat'l Hockey League*, 891 F.3d 289, 290–91 (7th Cir. 2018). A complaint needs to present only "a short and plain statement" of the basis for a claim. Fed. R. Civ. P. 8(a)(2). To avoid dismissal, the factual allegations in the complaint need not prove the claim. They need to show only that

the claim is "plausible on its face" and that if the allegations are true, the plaintiff is entitled to relief. *Roldan v. Stroud*, 52 F.4th 335, 339 (7th Cir. 2022), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This pleading standard is not demanding, asking that plaintiffs allege "only enough facts" to "nudge[ ] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

To be plausible rather than merely conceivable means that the complaint's "factual content … allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Firestone Financial Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015), quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The factual allegations must present "more than a sheer possibility" that the defendant's conduct is unlawful, *Iqbal*, 556 U.S. at 678, but a complaint should survive a motion to dismiss "even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Alam v. Miller Brewing Co.*, 709 F.3d 662, 666 (7th Cir. 2013), quoting *Twombly*, 550 U.S. at 556.

We explain next in Part B how plaintiffs have alleged a viable claim under 18 U.S.C. § 1595, addressing defendant Salesforce's counterarguments as we go. We then turn in Part C to Salesforce's attempt to establish a defense under 47 U.S.C. § 230.

B.  *Plausibly Alleging a Claim Under 18 U.S.C. § 1595*

Plaintiffs seek relief under Section 1595(a), which creates a civil cause of action for victims of Section 1591 of Title 18: "An individual who is a victim of a violation of this chapter may

No. 22-2621                                                    9

bring a civil action … ."[3] We first ask whether plaintiffs have alleged that G.G. is the victim of a criminal violation of Section 1591, which has the title "Sex trafficking of children or by force, fraud, or coercion." At the time of G.G.'s trafficking, Section 1591(a) provided in relevant part:

> (a) Whoever knowingly— (1) in or affecting interstate or foreign commerce … recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591(a) (2015).

---

[3] The referenced chapter is Chapter 77 of Title 18, which also includes criminal prohibitions on peonage, slavery, forced labor, and other forms of human trafficking, so Section 1595 offers a civil remedy for victims of those crimes, as well. We concentrate here on sex trafficking under Section 1591.

To prove a criminal violation of Section 1591, the govern-ment must prove that the defendant, with the requisite state of mind, either (1) engaged in one of the listed acts of sex traf-ficking or (2) benefitted from participating in a venture that engaged in one of those acts.

Plaintiffs have plausibly alleged that G.G. was a victim of violations of Section 1591. Obviously, there is G.G.'s street-level trafficker, who plaintiffs allege "used a combination of force, fraud, coercion, enticement, alcohol and drugs to cause" G.G., who was a minor, to "engage" repeatedly "in commercial sex." On these allegations, G.G.'s street-level traf-ficker could be criminally liable under Section 1591(a)(1): "Whoever knowingly … recruits, entices, harbors, transports, provides, obtains, [or] advertises … a person …, knowing … that means of force, threats of force, fraud, coercion …, or any combination of such means will be used to cause the person to engage in a commercial sex act."

Plaintiffs also allege that Backpage violated Section 1591 by advertising G.G. for sale both before and after learning that she was under the age of 18. On such allegations, Backpage could be subject to criminal liability under both Section 1591(a)(1) and (a)(2). By "knowingly … advertis[ing]" G.G., "knowing, or … in reckless disregard of the fact … that [G.G. had] not attained the age of 18 years and [would] be caused to engage in a commercial sex act," Backpage violated Section 1591(a)(1). And by "knowingly … benefit[ing] … from partic-ipation in" the street-level trafficker's "venture which [was] engaged in" acts that violated Section 1591(a)(1), "knowing, or … in reckless disregard of the fact … that [G.G. had] not attained the age of 18 years and [would] be caused to engage

in a commercial sex act," Backpage violated Section 1591(a)(2).

According to these allegations, then, G.G. was a victim of multiple violations of both Sections 1591(a)(1) and 1591(a)(2) at the hands of both her street-level trafficker and Backpage, so G.G. is a proper plaintiff under Section 1595. The statute's remaining elements determine whether Salesforce is a proper defendant.

Section 1595 creates two kinds of civil liability: perpetrator liability and participant liability. First, since it was first enacted, the statute has allowed the victim to sue "the perpetrator." 18 U.S.C. § 1595(a). Under a theory of perpetrator liability, G.G. could have sued either her street-level trafficker or Backpage, but neither is a defendant in this action. Second, since the 2008 amendment, the statute has allowed the victim to sue "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter," which includes Section 1591. 18 U.S.C. § 1595(a). Plaintiffs here seek to hold Salesforce liable as such a participant.[4]

---

[4] Courts unanimously agree that a civil defendant under Section 1595 need not have violated Section 1591. E.g., *Ricchio v. McLean*, 853 F.3d 553, 555–57 (1st Cir. 2017) (Souter, J.) (Section 1595 claim plausibly alleged based on violation of Section 1591 committed by trafficker who was not the civil defendant and implicitly approving of view that civil defendant need not have violated Section 1591); see also *Lundstrom v. Choice Hotels Int'l, Inc.*, No. 21-cv-00619-PAB-SKC, 2021 WL 5579117, at *4 (D. Col. Nov. 30, 2021); *S.Y. v. Naples Hotel Co.*, 476 F. Supp. 3d 1251, 1256 (M.D. Fla. 2020); *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 152–53 (E.D.N.Y. 2020); *A.C. v. Red Roof Inns, Inc.*, No. 2:19-cv-4965, 2020 WL 3256261, at *4 (S.D. Ohio June 16, 2020); *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171,

Under a theory of participant liability, a plaintiff like G.G. who is a victim of a criminal violation must allege and ultimately prove that (1) a venture has engaged in an act in violation of Section 1591, (2) the defendant knew or should have known that the venture had violated Section 1591, (3) the defendant participated in that venture, and (4) the defendant knowingly benefited from its participation.[5]

1.   *A Venture Which Has Engaged in an Act in Violation of Section 1591*

The first element is the existence of "a venture which … has engaged in an act in violation" of Section 1591. 18 U.S.C. § 1595(a). That Backpage committed multiple violations of Section 1591 is not in question. As discussed, Backpage violated Sections 1591(a)(1) and (a)(2) when it advertised G.G. for sale after learning that she was a minor and financially benefited from participation in her street-level trafficking.[6]

---

180–81, 182 (E.D. Pa. 2020); *Doe S.W. v. Lorain-Elyria Motel, Inc.*, No. 2:19-CV-1194, 2020 WL 1244192, at *4 (S.D. Ohio Mar. 16, 2020); *H.H. v. G6 Hospitality, LLC*, No. 2:19-CV-755, 2019 WL 6682152, at *2 (S.D. Ohio Dec. 6, 2019); *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 964 (S.D. Ohio 2019); *Jean-Charles v. Perlitz*, 937 F. Supp. 2d 276, 287 (D. Conn. 2013); *M.A. ex rel. P.K. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1056 (E.D. Mo. 2011).

[5] We have reorganized the most common summaries of these elements to follow a logical sequence rather than the sequence of the phrases in Section 1595. We hope this logical sequence may be useful in instructing juries about the issues they will need to consider in trials under Section 1595 against alleged participants in sex-trafficking ventures.

[6] In addition to these violations with respect to G.G., plaintiffs have alleged that Backpage's business was substantially devoted to criminal sex trafficking. During the years when Backpage and Salesforce were working together, Backpage had engaged and was continuing to engage in

Salesforce argues that plaintiffs have failed to allege that it participated in a venture that has violated Section 1591. Appellee's Br. at 53–65. That argument challenges two distinct elements, as we understand the statute, which we have labeled as element (1), the existence of a venture that violated Section 1591, and element (3), the defendant's participation in the venture.

Plaintiffs have sufficiently alleged the existence of a venture that violated Section 1591. The text of Section 1595 does not say "sex-trafficking venture," but only "venture." 18 U.S.C. § 1595(a). In other words, "venture" is not described in criminal terms. Indeed, it would make little sense if it did. The language that follows, "which … has engaged in an act in violation of this chapter," does that work, requiring the venture's criminality.

While Section 1595 does not define the term "venture," Section 1591's definition cuts against construing a "venture" narrowly as limited to a venture that is primarily a sex-trafficking venture. Section 1591 defines "venture" as "any group of two or more individuals associated in fact, whether or not a legal entity." 18 U.S.C. § 1591(e)(5). While we decline to

---

uncounted violations of Section 1591. When they entered into plea agreements with the Department of Justice in April 2018, Backpage and its CEO admitted that Backpage had operated as a site for the sale of sex since 2004. In the three years before G.G.'s trafficking in 2016—when Salesforce was facilitating the expansion of Backpage's business—Backpage generated more than 99% of its revenue from adult advertising. Not all that activity was necessarily criminal, but plaintiffs have plausibly alleged that at least a significant portion of Backpage's business involved criminal sex trafficking, "especially the trafficking of minors." It is reasonable to infer that the Department of Justice shut down Backpage because it had violated federal criminal sex-trafficking laws.

import Section 1591's definition into Section 1595, we think it safe to assume that Congress did not intend "venture" in Section 1595, which establishes civil liability, to be any more demanding than "venture" in Section 1591, which establishes criminal liability. See *Peyton v. Rowe*, 391 U.S. 54, 65 (1968) (applying "canon of construction that remedial statutes should be liberally construed").[7] Because Congress did not define a "venture" under Section 1591 as necessarily or primarily involving criminal conduct, we will not impose such a requirement under Section 1595.

In short, we agree with the district court that the relevant "venture" under Section 1595 need not be "specifically a sex trafficking venture." *G.G.*, 603 F. Supp. 3d at 644, quoting *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 970 (S.D. Ohio 2019). Rather, as the Eleventh Circuit has acknowledged, the alleged venture can be a "*commercial* venture[ ]" like running or expanding a business. See *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 727 (11th Cir. 2021) (emphasis added). While a "venture" can certainly run the gamut from an isolated act of sex trafficking to an international sex-

---

[7] In declining to import Section 1591's definition of "venture" into Section 1595, we recognize that the "'normal rule of statutory construction' [is] that words repeated in different parts of the same statute generally have the same meaning." *Law v. Siegel*, 571 U.S. 415, 422 (2014), quoting *Dep't of Revenue of Oregon v. ACF Industries, Inc.*, 510 U.S. 332, 342 (1994). But Section 1591's definitions are expressly limited to Section 1591 itself. 18 U.S.C. § 1591(e) ("In this section …"). That express limitation gives us good "reason to depart from" the normal rule of construction, see *Law*, 571 U.S. at 422, in addition to making sure we give effect to the separate language requiring "an act in violation of this chapter."

trafficking enterprise, it can also be a business whose primary focus is not on sex trafficking.[8]

Plaintiffs have alleged such a venture here. "By 2013," plaintiffs allege, "Backpage found itself in need of a partner who could facilitate and support [Backpage's] exponential growth." The "venture" was Backpage's business itself, including the "growth," "expansion," and profitability of that business.

> ## 2. *Salesforce's Constructive Knowledge That the Venture Had Engaged in an Act in Violation of Section 1591*

The next question is whether plaintiffs have plausibly alleged that Salesforce knew or should have known that Backpage's venture had engaged in acts in violation of Section 1591. Section 1595 provides for participant liability where the defendant "knew or should have known" that the "venture … has engaged in an act in violation" of Section 1591. 18 U.S.C. § 1595(a).[9]

---

[8] Nearly every court agrees. See *Lundstrom*, 2021 WL 5579117, at *5–6; *Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889, 916–18 (N.D. Cal. 2021); *J.L. v. Best Western Int'l, Inc.*, 521 F. Supp. 3d 1048, 1062 (D. Colo. 2021); *A.B. v. Hilton Worldwide Holdings Inc.*, 484 F. Supp. 3d 921, 937 (D. Or. 2020); *S.Y.*, 476 F. Supp. 3d at 1256; *S.J.*, 473 F. Supp. 3d at 152–53; *A.C.*, 2020 WL 3256261, at *6; *Doe S.W.*, 2020 WL 1244192, at *6; *H.H.*, 2019 WL 6682152, at *4; *Jean-Charles*, 937 F. Supp. 2d at 288. On the other side of this question, see *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 168–70 (S.D.N.Y. 2019) (concluding that the "participation giving rise to the benefit must be participation *in a sex-trafficking venture*, not participation in other activities engaged in by the sex traffickers that do not further the sex-trafficking aspect of their venture").

[9] This is a negligence standard, and all courts agree that a defendant under Section 1595 must have had at least constructive knowledge that the "venture" in question has engaged in an act in violation of Section 1591

Plaintiffs have plausibly alleged that Salesforce at least should have known that Backpage had repeatedly violated Section 1591 before Salesforce started working with Backpage and that Backpage was continuing to violate Section 1591 during their multi-year relationship.

According to the allegations in the complaint, by 2008—five years before Salesforce entered into its first contract with Backpage—"law enforcement, United States Attorneys General, and every state Governor" had "publicly identified" Backpage "as the biggest and most notorious sex trafficking and pimping website in the United States." In 2010, 21 state attorneys general called on Backpage "to shut down its adult services section." After a First Circuit decision in March 2016, *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016), afforded Backpage protection under Section 230 of the Communications Decency Act, the Senate investigated Backpage. H.R. Rep. No. 115-572, pt. 1, at 3–5 (Feb. 20, 2018). Nationwide news coverage identified Backpage as "the leading platform

in order for participant liability to attach. See *Red Roof Inns*, 21 F.4th at 725; *Lundstrom*, 2021 WL 5579117, at *5; *Doe v. Mindgeek USA Inc.*, 558 F. Supp. 3d 828, 839 (C.D. Cal. 2021); *Twitter, Inc.*, 555 F. Supp. 3d at 925; *J.L.*, 521 F. Supp. 3d 1062, 1076; *H.G. v. Inter-Continental Hotels Corp.*, 489 F. Supp. 3d 697, 704–05 (E.D. Mich. 2020); *M.L. v. Craigslist Inc.*, No. C19-6153 BHS-TLF, 2020 WL 5494903, at *5–6 (W.D. Wash. Sept. 11, 2020); *Hilton Worldwide Holdings Inc.*, 484 F. Supp. 3d at 937–39; *J.B. v. G6 Hospitality, LLC*, No. 19-cv-07848-HSG, 2020 WL 4901196, at *8–9 (N.D. Cal. Aug. 20, 2020); *S.Y.*, 476 F. Supp. 3d at 1256; *B.M. v. Wyndham Hotels & Resorts, Inc.*, No. 20-cv-00656-BLF, 2020 WL 4368214, at *5–6 (N.D. Cal. July 30, 2020); *S.J.*, 473 F. Supp. 3d at 152–54; *A.C.*, 2020 WL 3256261, at *4–5; *Marriott Int'l, Inc.*, 455 F. Supp. 3d at 189; *Doe 3 v. Red Roof Inns, Inc.*, No. 1:19-cv-03843-WMR, 2020 WL 1872333, at *3 (N.D. Ga. April 13, 2020); *Doe S.W.*, 2020 WL 1244192, at *5–6; *H.H.*, 2019 WL 6682152, at *3; *M.A.*, 425 F. Supp. 3d at 965–68.

for the facilitation of sex trafficking and other forms of human degradation." Salesforce's hometown newspaper, the San Francisco Chronicle, published no fewer than 400 prominent news articles about Backpage between 2009 and 2017, including several in 2012 linking Backpage to child sex-trafficking. A 2013 article revealed that the FBI was monitoring Backpage after rescuing more than 100 children from forced prostitution. These facts about its customer should have been known to Salesforce.

Apart from this public information, plaintiffs are entitled to a reasonable inference at this stage of the case that, based on Salesforce's relationship with Backpage, Salesforce either "knew or should have known" that at least a substantial part of Backpage's business was illegal sextrafficking, including trafficking of children. Federal Rule of Civil Procedure 9(b) allows plaintiffs to plead knowledge "generally." Plaintiffs have more than met their burden under this standard, alleging facts tending to show with greater specificity than is required at this stage that Salesforce at least should have known the nature of Backpage's business. At least constructive knowledge may be reasonably inferred from the allegations that Salesforce repeatedly consulted with Backpage "to assess its operational needs," designed "targeted solutions addressed to" those needs, and provided active, "tailored," and ongoing support as Backpage worked to expand its business and scale its operations. As the district court wrote, part of Salesforce's support for Backpage "require[d] Salesforce to analyze content … provided by Backpage about its customers." *G.G.*, 603 F. Supp. 3d at 635 (emphasis removed). While it might be possible that Salesforce's penny did not actually drop during its dealings with Backpage, plaintiffs are entitled to an inference that Salesforce at least should have known that

Backpage was engaged in criminal sextrafficking on a sub-stantial scale. Plaintiffs' allegations satisfy Section 1595's con-structive-knowledge requirement.

Salesforce disagrees, arguing that, under "the plain text" of Sections 1591 and 1595, a participant defendant must have had constructive knowledge of the *specific victim* of sex-traf-ficking, the plaintiff suing under Section 1595. Salesforce ar-gues that even if it knew or should have known that the ven-ture had violated Section 1591 with respect to other victims, it is off the civil hook unless plaintiffs can allege and later prove that it should have known about the trafficking of G.G. in par-ticular. Salesforce draws this conclusion from Section 1595's use of the phrases "*a* venture" and "*an* act." 18 U.S.C. § 1595(a) (2008) ("[W]hoever knowingly benefits, financially or by re-ceiving anything of value from participation in *a venture* which that person knew or should have known has engaged in *an act* in violation of this chapter.") (emphasis added).

We are not persuaded that "*a* venture" and "*an* act" mean "*the* victim." First, as explained above, "a venture" need not be primarily a *sex-trafficking* venture, so it need not be, as Salesforce suggests, "a *particular*" sex-trafficking venture. Even if it were, it would take an additional inferential leap to conclude that Section 1595 requires knowledge of a particular *victim* of that particular venture.

As for "an act," Salesforce's reading is contrary to the stat-utory text and overlooks differences between the two sec-tions. If Congress had meant in Section 1595 that the partici-pant must have had actual or constructive knowledge of the specific victim, it could have simply said so. It did not. Facing statutory text that does not say what it prefers, Salesforce asks us to make two interpretive moves to reach that result. First,

Salesforce asks us to read "*an* act" of sextrafficking as "*the* act" of victimization that allowed the plaintiff to bring suit under Section 1595. Salesforce then asks us to assume that knowledge of *the act* means knowledge of the *specific victim*. This goes two bridges too far. We see no reason to rewrite the statutory text by substituting "the" for "an." Even if we were willing to take that first step, we would still see no reason to require knowledge of a particular act to require knowledge of the victim's identity. Salesforce is arguing, in effect, that the larger the sex-trafficking venture and the more extensive its participation in the venture—and so the less likely it is to have known the specifics of individual victim—the harder it should be for a victim to obtain civil relief.

The cases Salesforce cites to support its argument—all hotel sex-trafficking cases—simply do not support requiring knowledge of the specific victim. In *S.J. v. Choice Hotels International, Inc.*, 473 F. Supp. 3d 147 (E.D.N.Y. 2020), for example, the court found meaning in "a venture" and "an act" as used in Section 1595, but not the meaning Salesforce tries to extract. Rather, the court relied on these phrases to point out that even "knowledge or willful blindness of a *general* sex trafficking problem in low-budget lodgings" could not plausibly show "knowledge of a specific sex trafficking venture" at the hotels the defendant had franchised. *Id.* at 154. As the court correctly observed, to allow allegations that a civil defendant was aware of sporadic sex trafficking in low-budget hotels generally to show constructive knowledge of a particular sex trafficking venture "unjustifiably bridges the scienter gap between 'should have known' and 'might have been able to guess.'" *Id.* In other words, the civil defendant needed to have constructive knowledge of a non-generalized and non-sporadic—a "particular"—venture, but the court did

Case 1:23-cv-00223-HYJ-SJB   ECF No. 63-1,  PageID.756   Filed 08/28/23   Page 20 of 45
Case: 22-2621      Document: 44        Filed: 08/03/2023      Pages: 45

20                                    No. 22-2621

not go so far as to require knowledge of a particular victim. *Id.*[10]

Other cases on which Salesforce relies are not persuasive here because they involved the trafficking of only one victim. In such cases, knowledge of the specific victim goes hand-in-glove with knowledge of the "venture." E.g., *Lundstrom*, 2021 WL 5579117, at *1–2, *6–8; *B.M.*, 2020 WL 4368214, at *5–6. Because the ventures and the victims were one and the same, these cases do not stand for the proposition that a civil defendant who participated in a venture engaged in sex trafficking on a substantial scale must have had constructive knowledge of the specific victim.[11]

If such specificity were required, Section 1595 would be severely undermined in some of the most egregious cases. A company like Salesforce could simply bury its head in the sand with respect to individual victims. It could work, for example, only with high-level data on behalf of a venture that the company knows or should know is engaged in illegal sex trafficking on a large scale. By way of analogy, a taxi service

---

[10] Likewise, in *Doe 3*, another case cited by Salesforce, the court found that allegations "that customers [had] complained about prostitution" taking place, generally, at the franchisors' hotels was, on its own, insufficient to meet Section 1595's constructive knowledge requirement for the franchisor itself, as distinct from individual franchisees. 2020 WL 1872333, at *1, *3 (granting motions to dismiss with leave to amend).

[11] Salesforce's remaining cases also do not help it. In all of them, the civil defendants did have constructive knowledge of the specific victim. See *S.Y.*, 476 F. Supp. 3d at 1257; *Marriott Int'l, Inc.*, 455 F. Supp. 3d at 181, 188, 192–94. The fact that constructive knowledge of the specific victim was shown and sufficient does not mean that the knowledge was also necessary.

transporting trafficking victims on behalf of traffickers could claim that it lacked constructive knowledge where it knew that it was generally transporting trafficking victims so long as the drivers were shielded from seeing who specifically was in the back of their taxis. Or consider a prostitution ring that hires a construction company to build a better brothel, one that attracts more customers and is better insulated from the prying eyes of law enforcement. The contractor knows that the business is generally engaged in sex trafficking, but so long as the contractor does not know of any individual victim, it would be insulated from civil liability. In other words, the larger the sex-trafficking venture, the less likely a victim would be able to prove sufficient knowledge. Nothing in the statutory text requires such an odd result.[12]

In short, we agree with the majority of courts that have addressed Section 1595's constructive-knowledge requirement that the statutory text does not require allegations and ultimately proof that the defendant knew or should have known of the specific victim who has brought the civil action.

---

[12] In *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206 (2023), the Supreme Court addressed secondary civil liability for acts of international terrorism under a statute that requires proof of criminal mens rea for aiding and abetting. Even under that standard, which is more demanding than Section 1595, *Twitter* recognized that a defendant might provide a criminal enterprise with aid "so intentional and systematic" that the defendant would be liable without having known of the specific crime, let alone its foreseeable consequences, extending even to murder as a foreseeable consequence of a burglary. 143 S. Ct. at 1224, discussing *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which Congress had cited with approval in enacting the terrorism statute. As we discuss in more detail below, plaintiffs here have alleged that Salesforce gave aid to Backpage that can fairly be described as intentional and systematic, with at least constructive knowledge of Backpage's sex trafficking of minors.

To state a claim under Section 1595, a plaintiff needs to allege plausibly that the defendant had constructive knowledge that a venture *generally* has violated Section 1591. Knowledge of the specific victim, let alone knowledge of her identity, cf. post at 45, is not required. Plaintiffs here have therefore sufficiently alleged constructive knowledge under Section 1595.[13]

### 3. *Participation*

The next question is whether plaintiffs have sufficiently alleged that Salesforce, with that constructive knowledge, *participated* in Backpage's venture. They have.

Congress has not defined "participation" under Section 1595. Section 1591 defines "participation in a venture" as "knowingly assisting, supporting, or facilitating a violation" of Section 1591(a)(1). 18 U.S.C. § 1591(e)(4) (April 2018, December 2018). We agree with the Eleventh Circuit that we should not import that definition into Section 1595. See *Red Roof Inns*, 21 F.4th at 724.[14] Still, Section 1591's definition can

---

[13] See *M.L.*, 2020 WL 5494903, at *5–6 (explicitly rejecting the contention that the civil defendant must have had constructive knowledge of the victim's "*specific* trafficking, rather than general, abstract knowledge of potential trafficking"); *S.Y.*, 476 F. Supp. 3d at 1257; *A.C.*, 2020 WL 3256261, at *4–5; *Marriott Int'l, Inc.*, 455 F. Supp. 3d at 181, 188, 192–94; *H.H.*, 2019 WL 6682152, at *3; *Doe S.W.*, 2020 WL 1244192, at *5–6; *M.A.*, 425 F. Supp. 3d at 965–68. But see *Mindgeek USA Inc.*, 558 F. Supp. 3d at 838–39; *Twitter, Inc.*, 555 F. Supp. 3d at 925; *J.L.*, 521 F. Supp. 3d at 1068, 1072–73, 1076–77.

[14] As with "venture," Section 1591(e) limits definition of "participation in a venture" expressly to Section 1591. In addition, "we must normally seek to construe Congress's work 'so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022), quoting *Corley v. United States*, 556 U.S. 303, 314 (2009). As the Eleventh Circuit has observed, if we incorporate Section 1591's "knowingly" scienter into

establish the upper limits of "participation" under Section 1595. As with "venture," we should "liberally" construe "participation" so that the civil remedy does not demand more of the plaintiff than a criminal prosecution demands of the government. See *Peyton*, 391 U.S. at 65. "Participating" does not therefore require more than "assisting, supporting, or facilitating" a venture that violates Section 1591. 18 U.S.C. § 1591(e)(4) (April 2018, December 2018).

Mindful of that ceiling, we agree with the district court that "participation" does not require "direct participation in the sex trafficking." *G.G.*, 603 F. Supp. 3d at 644, quoting *M.A.*, 425 F. Supp. 3d at 970.[15] While direct involvement in sex

---

Section 1595, we render "superfluous" Section 1595's "'should have known' language." *Red Roof Inns*, 21 F.4th at 724. Accord, *Lundstrom*, 2021 WL 5579117, at *5–6; *Mindgeek USA Inc.*, 558 F. Supp. 3d at 836; *Twitter, Inc.*, 555 F. Supp. 3d at 916–18; *J.L.*, 521 F. Supp. 3d at 1062; *Hilton Worldwide Holdings Inc.*, 484 F. Supp. 3d at 937; *J.B.*, 2020 WL 4901196, at *8; *S.Y.*, 476 F. Supp. 3d at 1256–57; *S.J.*, 473 F. Supp. 3d at 153; *A.C.*, 2020 WL 3256261, at *6–7; *J.C. v. Choice Hotels Int'l, Inc.*, No. 20-cv-00155-WHO, 2020 WL 3035794, at *1 n.1 (N.D. Cal. June 5, 2020); *Marriott Int'l, Inc.*, 455 F. Supp. 3d at 183–88; *Doe S.W.*, 2020 WL 1244192, at *6; *H.H.*, 2019 WL 6682152, at *4; *M.A.*, 425 F. Supp. 3d at 968–70 (declining to import Section 1591's definition of "participation in a venture" into Section 1595 because doing so would belie the text of Section 1591(e), which "purports to only apply to 'this section,'" and would "void the 'known or should have known' language" of Section 1595). Contra, *Geiss*, 383 F. Supp. 3d at 168–70 (relying on *United States v. Afyare*, 632 F. App'x 272, 286 (6th Cir. 2016), to import Section 1591's definition of "participation in a venture" into Section 1595); *Canosa v. Ziff*, No. 18 Civ. 4115 (PAE), 2019 WL 498865, at *24 (S.D.N.Y. Jan. 28, 2019) (same); *Noble v. Weinstein*, 335 F. Supp. 3d 504, 523–24 (S.D.N.Y. 2018) (same).

[15] As one district court put it, a participant defendant need not have committed "some 'overt act' that furthers the sex trafficking aspect of the venture" or have "associated" with the sex trafficker "for the purpose of

trafficking itself (e.g., transporting victims, providing hotel rooms) would satisfy Section 1595's "participation" element, direct involvement goes beyond what the statutory text requires. Since the "venture" in question need not be primarily a sex-trafficking venture and the civil defendant itself need not have committed a criminal violation of Section 1591, "participation in" that venture need not involve direct participation in the sex trafficking itself. It is the venture that must violate Section 1591, and not the participant.

We read "participation" in accord with our "ordinary understanding of culpable assistance to a wrongdoer," which requires only "a desire to promote the wrongful venture's success," *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003), though Section 1595 does not require actual knowledge of criminal wrongdoing. We agree with the district court that a plaintiff may sufficiently allege such "culpable assistance" by

---

furthering the sex trafficking." *M.A.*, 425 F. Supp. 3d at 968–69 (rejecting those requirements under Section 1595 because Sixth Circuit had developed them in criminal context under Section 1591), quoting *United States v. Afyare*, 632 F. App'x 272, 286 (6th Cir. 2016). The vast majority of district courts agree. See *Lundstrom*, 2021 WL 5579117, at *5–6 (noting that, to read such requirements into "participation in a venture" would draw civil liability under Section 1595 dangerously close to criminal liability under the Racketeer Influenced and Corrupt Organizations (RICO) Act); *Twitter, Inc.*, 555 F. Supp. 3d at 916–18; *J.L.*, 521 F. Supp. 3d at 1062; *Hilton Worldwide Holdings Inc.*, 484 F. Supp. 3d at 937; *S.Y.*, 476 F. Supp. 3d at 1256; *S.J.*, 473 F. Supp. 3d at 152–53; *A.C.*, 2020 WL 3256261, at *6–7; *J.C.*, 2020 WL 3035794, at *1 n.1; *Marriott Int'l, Inc.*, 455 F. Supp. 3d at 185–88; *Doe S.W.*, 2020 WL 1244192, at *6–7; *H.H.*, 2019 WL 6682152, at *4. But see *Geiss*, 383 F. Supp. 3d at 168–70 ("The participation giving rise to the benefit must be participation *in a sex-trafficking venture*, not participation in other activities engaged in by the sex traffickers that do not further the sex-trafficking aspect of their venture."), citing *Afyare*, 632 F. App'x at 286.

No. 22-2621                                                    25

showing "a continuous business relationship" between the participant and the trafficker. *G.G.*, 603 F. Supp. 3d at 644, quoting *J.B.*, 2020 WL 4901196, at *9. Where the participant provides assistance, support, or facilitation to the trafficker through such a "continuous business relationship," a court or jury may infer that the participant and trafficker have a "tacit agreement" that is sufficient for "participation" under Section 1595. See *M.A.*, 425 F. Supp. 3d at 970–71; accord, *Ricchio v. McLean*, 853 F.3d 553, 555 (1st Cir. 2017) (Souter, J.) (concluding that "participation" can be inferred, in part, where trafficker and civil defendants—the owners of a hotel the trafficker used for his venture—had prior similar dealings).[16] To survive a motion to dismiss, all that is necessary is for a plaintiff to allege such a "continuous business relationship," which gives rise to an inference, drawn in the plaintiff's favor, that the civil defendant facilitated the venture's success.[17]

Plaintiffs have plausibly alleged here such a "continuous business relationship." According to the allegations,

---

[16] See also *Doe v. Reddit, Inc.*, No. SACV 21-00768 JVS (KESx), 2021 WL 5860904, at *7–8 (C.D. Cal. Oct. 7, 2021); *Mindgeek USA Inc.*, 558 F. Supp. 3d at 837–38; *Twitter, Inc.*, 555 F. Supp. 3d at 917–18; *J.B.*, 2020 WL 4901196, at *8–9; *A.C.*, 2020 WL 3256261, at *6; *Marriott Int'l, Inc.*, 455 F. Supp. 3d at 186; *Doe S.W.*, 2020 WL 1244192, at *6; *H.H.*, 2019 WL 6682152, at *4.

[17] The district court wrote in this context that "Salesforce did not take part in the construction of the business itself." *G.G.*, 603 F. Supp. 3d at 648. In context, we understand the court to have meant that if Salesforce had merely sold Backpage an off-the-shelf software package, it would not have participated in the trafficking venture. The general point may be correct, at least with respect to a one-time sale of an off-the-shelf product. As explained below, however, plaintiffs have alleged that Salesforce was much more involved in helping Backpage grow its business with advice and consulting about how best to use Salesforce's software.

Backpage was trying "to keep pace with increasing customer demand and scale its platform," so it sought out "a partner who could facilitate and support the company's exponential growth." According to plaintiffs, Backpage found that partner in Salesforce, which "entered into the first of several lucrative contracts with Backpage" in 2013. Through those contracts, Salesforce provided Backpage with "targeted solutions addressed to the needs of Backpage's business," repeatedly assessed Backpage's "operational needs," and provided "active, ongoing support" that was "tailored" to those needs.[18]

With that support, Backpage was able to build relationships with more street-level traffickers, to increase the "scale [of] its operations," and to "increase the trafficking conducted" through its site. During the course of their business relationship, which continued until Backpage was seized by the Department of Justice, Backpage was transformed from a

---

[18] Salesforce asserts that plaintiffs' "characterization" of the software and services it provided to Backpage "as 'unique,' targeted, or 'personalized,'" is "conclusory." The district court seemed to accept this argument in criticizing plaintiffs for not alleging more specific examples of Salesforce's custom-tailored services. 603 F. Supp. 3d at 648. We respectfully disagree. Plaintiffs' allegations along these lines are not conclusory, but factually and specifically descriptive. Conclusory allegations are those that parrot "legal conclusions," merely reciting "the elements of a cause of action," while couching them as "'factual allegation[s.]'" *Iqbal*, 556 U.S. at 678, quoting *Twombly*, 550 U.S. at 555. The language Salesforce criticizes does not either draw a legal conclusion or reframe the elements under Section 1595. Rather, the language adds helpful detail. Just as a "tailored suit" is different from a "suit," so "tailored services" are a narrower concept than "services." The same is true of "unique needs," "targeted solutions," and "personalized support." On this point, the district court required too much detail at the pleading stage.

"small … company with a handful of employees to an international powerhouse with over 250 employees spanning three continents." In the first three years, Backpage's gross revenues grew by a factor of five. And as Backpage expanded, so did the scope of Salesforce's support and its income from the contracts. In short, Salesforce facilitated the growth of Backpage's business, a business that was almost exclusively a sex-trafficking business and that had engaged in multiple acts in violation of Section 1591, nay, whose business model was built upon systematic and widespread violations of Section 1591.

Salesforce argues that "participation" requires more, that plaintiffs have alleged only that Salesforce was "somehow connected" to Backpage's sex-trafficking enterprise. R. 26, Appellee's Br. at 53. The argument is not persuasive. First, Salesforce argues that plaintiffs have failed to "connect Salesforce or its software" to "G.G.'s trafficking or her trafficker." Put differently, Salesforce tries to narrow the focus of the "participation" inquiry to Backpage's advertisements of G.G. herself, asserting that Salesforce had no specific involvement with those advertisements. That focus is simply too narrow. As a matter of law, such a direct connection between Salesforce and G.G.'s trafficking is not necessary. Under Section 1595, we focus on participation in a "venture," not participation in "an act in violation" of Section 1591. 18 U.S.C. § 1595. In other words, participant liability does not require direct participation in sex trafficking.

By Salesforce's logic, there would be no "participation" where a company helped a drug kingpin expand his drug-trafficking operations writ large because the company might not have been involved in pushing drugs in a particular

market. Or, for that matter, where a company helped a terrorist organization grow its terrorist network because the company could not be connected directly to a specific terrorist act. The statutory text does not support such narrowing interpretations. Contrary to Salesforce's arguments, "participation" does not require getting your hands dirty. It is enough that plaintiffs allege that Salesforce facilitated the success of Backpage's sex-trafficking venture *as a whole*.

Furthermore, Salesforce's argument fails to engage with plaintiffs' actual allegations. Salesforce seems to assume that G.G. had only one trafficker—the street-level trafficker who physically forced her into prostitution. But that person was not G.G.'s sole sex trafficker under Section 1591. According to the allegations in plaintiffs' complaint, Backpage was also a sex trafficker. Contrary to Salesforce's assumptions, therefore, Salesforce was not one step removed from G.G.'s traffickers. It was in a direct, prolonged, and supportive contractual relationship with one of those sex traffickers—Backpage.

Because of these differences, Salesforce's reliance on the Eleventh Circuit's decision in *Doe #1 v. Red Roof Inns, Inc.* is misplaced. In *Red Roof Inns*, the Eleventh Circuit defined "participation in a venture" as taking "part in a common undertaking or enterprise involving risk and potential profit." 21 F.4th at 725. The court then analyzed claims against hotel franchisors to see if they had taken "part in the common undertaking of sex trafficking with hotel employees, management, owners, and sex traffickers." *Id.* at 726. The plaintiffs had alleged that "the franchisors 'owned, managed, supervised, operated, oversaw, controlled the operation of, and/or were inextricably connected to the renting of rooms' at the hotels." *Id.* They also alleged that the franchisors had

"investigated the individual hotels, [taken] remedial action when revenue was down, read online reviews mentioning prostitution and crime occurring generally at the hotels, and controlled the training of managers and employees who were allegedly involved in facilitating sex trafficking at the hotels." *Id.* at 727.

On these allegations, the Eleventh Circuit concluded that plaintiffs had failed to allege that the franchisors had participated in a "common undertaking or enterprise with the Does' sex traffickers or others at the hotel who violated" Section 1591. *Id*. Key to the court's reasoning was how the plaintiffs had chosen to define the alleged venture—specifically as a "sex trafficking" venture. The court wrote that, if the plaintiffs had alleged "that the franchisors participated in *commercial ventures* to operate hotels and that those hotel ventures violated" Section 1591, the result might have been different. *Id.* (emphasis added). The court rejected this framing, however, because the plaintiffs had not alleged it in their complaint or presented it to the district court.

But here, plaintiffs have framed the venture in just those terms. They allege that Salesforce "participated in commercial ventures" with Backpage to grow its business and that Backpage "violated the statute." See *Red Roof Inns*, 21 F.4th at 727. Not only that, but the relationships in play here are distinct from those in play in *Red Roof Inns*. The franchisor defendants in that case were one step removed from the sex traffickers (i.e., street-level trafficker –> hotel –> hotel franchisor). Here Salesforce had a direct and long-term contractual relationship with sex-trafficker Backpage. So even if we applied the *Red Roof Inns* definition of "participation in a venture" to the allegations here, plaintiffs would have plausibly alleged that

element. See *id.* at 729 (Jordan, J., concurring) ("[S]imilar claims against … [the] franchisees … would withstand a Rule 12(b)(6) motion to dismiss."). That is, Salesforce "took part in" the expansion and success of Backpage—"a common undertaking or enterprise involving risk and potential profit." See *id.* at 725.[19]

In a similar vein, Salesforce argues that it merely provided Backpage with its software and Backpage did the rest. This argument also invites us to disregard plaintiffs' actual allegations. We assume that "participation" requires more than providing off-the-shelf software (or other common products or services from furniture to telephones or pizza deliveries). But the allegations here do not paint Salesforce as an armslength seller of off-the-shelf products. Plaintiffs allege that Salesforce "did not merely sell [Backpage] an off-the-shelf product that enabled Backpage to grow without the input of Salesforce." "Rather, Salesforce sold Backpage targeted solutions addressed to the needs of Backpage's business," repeatedly assessed Backpage's "operational needs," and provided "active, ongoing support" that was "tailored" to those needs.

These allegations defeat Salesforce's reliance on *Doe v. GTE Corp.*, 347 F.3d 655 (7th Cir. 2003), and *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015). In *GTE Corp.*, plaintiffs had been secretly recorded on video while they were undressed in "locker rooms, bathrooms, and showers." 347 F.3d at 656. Plaintiffs sued the company that had provided webhosting services for websites that had offered the videos for sale. *Id.* at 656–57. We affirmed dismissal on the pleadings,

---

[19] Salesforce's reliance on *B.M.*, 2020 WL 4368214, at *5, is misplaced for the same reasons.

concluding that the alleged activities of the web-hosting services did not amount to "culpable assistance" to those websites or the sellers of the videos because a "web host, like a delivery service or phone company, is an intermediary and normally is indifferent to the content of what it transmits." *Id.* at 659.

In *Backpage.com, LLC*, the Sheriff of Cook County had pressured credit card companies to stop processing transactions on Backpage. 807 F.3d at 230. Ordering an injunction against the Sheriff for violating Backpage's First Amendment rights, we concluded that the credit card companies were only "remote intermediaries," indifferent to any of Backpage's allegedly illegal activities. *Id.* at 233–34, 239.

The allegations here are different. According to plaintiffs, Salesforce was not a remote intermediary "indifferent" to Backpage's enterprise. If Backpage had merely purchased an off-the-shelf product from Salesforce, as any company might purchase bookkeeping or word-processing software, then *GTE* and *Backpage.com* might help Salesforce. But plaintiffs have described a relationship between Salesforce and Backpage much closer than that between a web-hosting service or a credit-card payment processor and a website. Salesforce and Backpage entered multiple contracts over a number of years whereby Salesforce provided Backpage with software designed specifically for Backpage and affirmative, "personalized support." Salesforce's support of Backpage's business was not generic, but "targeted" to Backpage's specific needs. Salesforce repeatedly consulted with Backpage, including its CEO, "to assess its operational needs" and provided "active, ongoing support" that was "tailored" to Backpage's evolving

business. This was not a sale by a "remote intermediary" but the active participation of a contractual partner.

Salesforce insists that our interpretation of "participation" threatens to sweep up "a convenience store that sells disposable cell phones or a clothing store that sells an outfit used as a disguise." These are precisely the kind of routine sales of off-the-shelf products or standard services that we do not view as amounting to "participation." Salesforce supports its policy concerns with *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206 (2023), where the Supreme Court interpreted the civil liability provisions of the Justice Against Sponsors of Terrorism Act, 18 U.S.C. § 2333. *Twitter* recognized the significant policy choices Congress makes when it authorizes civil liability for deep-pocket associates of judgment-proof wrongdoers, as it has in many contexts. We do not ignore these policy concerns here but instead consider them with our focus on the language and context of the particular statute in question, Section 1595.

The statute in *Twitter*, for example, authorizes civil liability against "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2). The Court's opinion focused on that language, which echoes the criminal law of aiding and abetting and requires actual knowledge, "conscious, voluntary, and culpable participation in another's wrongdoing." 143 S. Ct. at 1223. *Twitter* affirmed dismissal of claims against three large internet platforms whose relationships with terrorist users were "arm's length, passive, and largely indifferent." *Id*. at 1227. For another example, it is a federal crime to provide "material support or resources" for terrorists,

"*knowing or intending* that they are to be used in preparation for, or in carrying out" any of a long list of terrorist crimes. 18 U.S.C. § 2333A(a) (emphasis added); *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) (upholding law against First Amendment and vagueness challenges).

By comparison, Congress drafted Section 1595(a) so that participant liability for sex trafficking does *not* require proof of the criminal mens rea needed for aiding and abetting. Still, as explained above, we read Section 1595(a)'s standard of knowing benefit from participation in a venture that has violated Section 1591 to require more than what *Twitter* called "mere passive nonfeasance" or an "arm's length, passive, and largely indifferent" relationship with the criminal. See 143 S. Ct. at 1227. Plaintiffs here have alleged that Salesforce provided Backpage with aid much more "direct, active, and substantial" than was alleged in *Twitter*. See *id.* at 1228.

Salesforce also cites *United States v. Hansen*, 143 S. Ct. 1932 (2023), to support its argument that "participation in a venture" under Section 1595 requires mens rea "akin to that required for aiding and abetting." Noting that, when "Congress 'borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word,'" *Hansen* held that the phrase "encourages or induces" in 8 U.S.C. § 1324(a)(1)(A)(iv) was used "in its specialized, criminal-law sense" and thus incorporated "common-law liability for solicitation and facilitation." 143 S. Ct. at 1942, quoting *Morissette v. United States*, 342 U.S. 246, 263 (1952).

That holding might aid our reading of the criminal provisions of Section 1591, but it does not help with civil liability

under Section 1595. Salesforce's reliance on *Hansen* attempts to elide the difference between these two statutes and proposes to transplant Section 1591's definition of "participation in a venture" into Section 1595. As explained above, though, that definition is expressly limited to Section 1591. Congress could have transplanted it into Section 1595 when amending the statutes in 2018, but it declined to do so. Compare 18 U.S.C. § 1591(e)(4) (2018) with 18 U.S.C. § 1595 (2018). We decline to do so as well.

In sum, plaintiffs have not, as Salesforce contends, "conflated" Salesforce's conduct with Backpage's. Plaintiffs are seeking, as Section 1595(a) allows, to hold Salesforce liable for its own conduct in facilitating the success of Backpage's business, which engaged in uncounted acts in violation of Section 1591, including those that harmed G.G. Based on the repeated and allegedly lucrative contracts between Salesforce and Backpage, we draw the reasonable inference in plaintiffs' favor that Salesforce participated with Backpage in the venture of Backpage's sex-trafficking business by helping it grow.

### 4. *Knowing Benefit*

According to the language of Section 1595, a plaintiff can allege that the defendant "knowingly benefitted" by alleging only that the defendant was aware that it was benefitting in some way from its participation in the venture. That's it. As the district court correctly observed, the benefit need not take the form of "profits" that are "the specific result" of a sex-trafficking venture. *G.G.*, 603 F. Supp. 3d at 643. Here, the allegations that Salesforce was aware that it was benefiting, financially and otherwise, from its numerous contracts with Backpage are enough to satisfy the "knowingly benefits" element.

Salesforce thinks that the statutory text requires more. Relying on one district court decision—*Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 168–70 (S.D.N.Y. 2019)— Salesforce argues that the "knowingly benefits" element requires (1) "'a causal relationship' between the defendant's 'affirmative conduct furthering the sex-trafficking venture and receipt of a benefit,'" and (2) "that the defendant received the benefits with 'knowledge of that causal relationship."

In *Geiss*, three women brought a civil action against film producer Harvey Weinstein, his companies, and the companies' officers and directors alleging that Weinstein had sexually harassed and assaulted them and that "the other defendants knew of, facilitated, and covered up his misconduct." *Id.* at 161–62, 165, 167. The court found that the defendants "undoubtedly benefited" from Weinstein's continued employment and that some of the revenue generated by Weinstein's "movies and influence … flowed to" the defendants. *Id.* at 169. But that was not enough. As the court saw it, the "controlling question" was whether Weinstein "provided any of those benefits" to the other defendants *"because of* [their] facilitation of [his] sexual misconduct." *Id.* at 169 (emphasis in original). In short, *Geiss* read "knowingly benefits" to require a *quid pro quo* between trafficker and participant. But Section 1595 says nothing about *why* the sex-trafficker provides any benefit to the participant-defendant. In fact, the statute does not even require that the sex trafficker itself or himself provide any benefit. Section 1595 uses the passive voice: "Whoever knowingly benefits…." 18 U.S.C. § 1595(a).

The *Geiss* court and Salesforce's reading thus find no footing in the statutory text.[20]

Again, as the statutory text clearly dictates, where the defendant is simply aware that it is benefiting, that is enough. According to the allegations here, Salesforce and Backpage entered into multiple contracts over several years that called for close business advice and consulting. Salesforce's awareness that it was benefiting from those contracts is enough to satisfy the "knowingly benefits" element.

In sum, plaintiffs have plausibly alleged a claim under Section 1595. G.G. was a victim of multiple violations of Section 1591 at the hands of both her street-level trafficker and Backpage. Backpage's business was a venture that repeatedly engaged in acts that violated Section 1591, and Salesforce at least should have known that Backpage's venture had violated and was continuing to violate that statute. The continuous business relationship between Salesforce and Backpage

---

[20] Consequently, *Geiss* is an outlier whose gloss on "knowingly benefits" has been rejected by virtually every other court. See *Red Roof Inns, Inc.*, 21 F.4th at 723–24 (concluding that a plaintiff must allege only "that the defendant knew it was receiving some value from participating in the alleged venture"); *Ricchio*, 853 F.3d at 556. See also *Lundstrom*, 2021 WL 5579117, at *4–5; *Twitter, Inc.*, 555 F. Supp. 3d at 902, 905–06; *J.L.*, 521 F. Supp. 3d at 1060–61; *Hilton Worldwide Holdings Inc.*, 484 F. Supp. 3d at 935–36; *S.Y.*, 476 F. Supp. 3d at 1257; *B.M.*, 2020 WL 4368214, at *4; *A.C.*, 2020 WL 3256261, at *4; *Doe S.W.*, 2020 WL 1244192, at *5; *H.H.*, 2019 WL 6682152, at *2; *M.A.*, 425 F. Supp. 3d at 964–65 (rejecting *Geiss* and concluding that "the rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet" the "knowingly benefit" element). But see *Canosa*, 2019 WL 498865, at *24 (civil defendants had "symbiotic relationship" with film producer Harvey Weinstein that evinced "causal link between their acts and practices").

was sufficient to show that Salesforce participated in Back-page's venture and knowingly benefitted from it.

### C. *Whether Defendant is Protected by 47 U.S.C. § 230(c)*

Salesforce also argues that even if plaintiffs have other-wise pled a viable claim under Section 1595, Section 230(c) of the Communications Decency Act, 47 U.S.C. § 230, gives Salesforce a complete defense. Again, we begin with the stat-ute's text. Section 230(c) is entitled "Protection for 'Good Sa-maritan' blocking and screening of offensive material" and reads: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1) (1998).[21]

As we have said repeatedly, Section 230(c)(1) "does not create an 'immunity' of any kind." *City of Chicago v. StubHub!, Inc.*, 624 F.3d 363, 366 (7th Cir. 2010), citing *Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 669–71 (7th Cir. 2008); *GTE Corp.*, 347 F.3d at 660. Rather, Section 230(c)(1) "limits who may be called the pub-lisher of information that appears online." *StubHub*, 624 F.3d at 366. In this way, it functions as an affirmative defense. *GTE Corp.*, 347 F.3d at 657. That affirmative defense requires a civil defendant to establish three elements: (1) the defendant is the

---

[21] In 2018, Congress amended Section 230 via the Allow States and Victims to Fight Online Sex Trafficking Act (FOSTA), 47 U.S.C. § 230 (2018). Although the parties have devoted substantial portions of their briefs to how FOSTA functions when a Section 230 defense is raised, all agree that FOSTA comes into play only when the defendant has an other-wise viable defense under Section 230. Because we conclude that Salesforce cannot satisfy all the elements of Section 230's affirmative de-fense, we need not reach questions raised about FOSTA's interpretation.

"provider or user of an interactive computer service," and (2) the defendant is being "treated as the publisher or speaker" of (3) "information provided by another information content provider." 47 U.S.C. § 230(c)(1).

A plaintiff "ordinarily need not anticipate and attempt to plead around affirmative defenses," but dismissal may be appropriate if "the factual allegations in the complaint unambiguously establish all the elements of the defense." *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016). The district court found that plaintiffs had pled themselves out of court with factual allegations that satisfied all three elements. First, the court found that plaintiffs' allegations showed that Salesforce qualified as an "interactive computer service." *G.G.*, 603 F. Supp. 3d at 634.[22] Because Salesforce—in the course of "managing … relationships" between "Backpage and its customers"—was required "to analyze … content provided *by Backpage* about its customers," the district court found that Salesforce was "an access software provider." *Id.* at 635 (emphasis in original).[23]

---

[22] "The term 'interactive computer service' means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2).

[23] "The term 'access software provider' means a provider of software (including client or server software), or enabling tools that do any one or more of the following: (A) filter, screen, allow, or disallow content; (B) pick, choose, analyze, or digest content; or (C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content." 47 U.S.C. § 230(f)(4).

We need not resolve whether Salesforce qualifies as a "provider … of an interactive computer service." The allegations do not support the second and third elements of Section 230(c)(1)'s affirmative defense. Plaintiffs' claim does not treat Salesforce as (2) "the publisher or speaker" of (3) "information provided by another information content provider." 47 U.S.C. § 230(c)(1).

Section 230(c) "might matter to liability for" claims that "depend on who 'publishes' … information or is a 'speaker'"—for, say, "defamation, obscenity, or copyright infringement"—but where the claim does not depend on publishing or speaking, Section 230(c) "is irrelevant." *StubHub*, 624 F.3d at 366; accord, *Huon v. Denton*, 841 F.3d 733, 741 (7th Cir. 2016) (defendant could be treated as publisher "for purposes of defamation and other related theories of liability"); *Craigslist, Inc.*, 519 F.3d at 668, 671 (finding that "only in a capacity as publisher could craigslist be liable under" 42 U.S.C. § 3604(c), which prohibits only conduct that amounts to publishing); *GTE Corp.*, 347 F.3d at 660 (Section 230(c)(1) potentially "forecloses any liability that depends on deeming [the party] a 'publisher'").

Here, plaintiffs' allegations simply do not seek to treat Salesforce as a publisher or speaker. Plaintiffs' claim does not depend on Salesforce having published or spoken anything. Rather, plaintiffs seek to hold Salesforce accountable for *supporting* Backpage, for *expanding* Backpage's business, for *providing* Backpage with technology, for *designing* custom software for Backpage, for *facilitating* the trafficking of G.G., for *helping* Backpage with *managing* its customer relationships, *streamlining* its business practices, and *improving* its profitability, and for *enabling* Backpage "to scale its operations

and increase the trafficking conducted on Backpage." Dkt. 85,
¶¶ 1–3, 33, 29–30, & 41. In other words, plaintiffs are seeking
to hold Salesforce "liable under [Section 1595] for its own …
acts or practices, rather than for publishing content created by
another." See *Federal Trade Comm'n v. LeadClick Media, LLC*,
838 F.3d 158, 175–76 (2d Cir. 2016) (civil defendant not pro-
tected by Section 230(c)(1) where substantive statute, Section
5 of FTC Act, imposed liability for far more conduct than pub-
lishing or speaking and defendant was charged with "partic-
ipating" in scheme that violated Act).

We are not saying that "the name of the cause of action"—
defamation versus participation and so on—determines
whether a defendant can be treated as a publisher or speaker.
See *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101–02 (9th Cir. 2009).
We agree with the Ninth Circuit that we must focus on
"whether the duty that the plaintiff alleges the defendant vi-
olated derives from the defendant's status or conduct as a
'publisher or speaker.'" *Id.* at 1102.

In this case, plaintiffs allege that Salesforce had a duty not
to benefit knowingly from participating in Backpage's ven-
ture while knowing or having reason to know that the venture
was engaged in sex trafficking. That duty does not depend in
any way on Salesforce's supposed "status or conduct as a
'publisher or speaker.'" See *id.*

To be sure, Backpage itself was a publisher.[24] But the fact
that publishing was involved somewhere in G.G.'s trafficking

---

[24] Backpage's successful invocation of Section 230 to shield itself from
liability in *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016),
seems to have motivated Congress to amend Section 230 in 2018 in the
Allow States and Victims to Fight Online Sex Trafficking Act ("FOSTA").
47 U.S.C. § 230(e)(5) (2018). Reacting in part to that First Circuit decision,

No. 22-2621                                                                    41

does not mean that Salesforce can successfully use Section 230(c) to shield itself from liability for having participated in Backpage's venture. Publishing activity was "a but-for cause of just about everything" Backpage was involved in. See *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 853 (9th Cir. 2016). It was an online marketplace. "Without publishing user content," Backpage would not have existed. See *id.*

But Section 230 "does not provide a general immunity against all claims derived from third-party content." *Id.* Salesforce was simply not involved in any publishing. Salesforce's job was, in part, to help Backpage reach more customers, both in the form of sex traffickers and purchasers of commercial sex. In a sense, Salesforce helped Backpage find more sex-trafficking contractors. Plaintiffs' allegations therefore do not treat Salesforce as a publisher or speaker even if Backpage's publishing played a critical role in causing G.G.'s ultimate injury at the hands of her trafficker.

Plaintiffs also have not alleged that Salesforce ever "published" any *third-party* content. The only audience for the data Salesforce put online was Backpage itself, and Backpage provided Salesforce with that data. *G.G.*, 603 F. Supp. 3d at 635. It does not make sense to treat Salesforce as "publishing" to Backpage itself content that came from Backpage. With respect to any content that was provided by Backpage, Salesforce fails Section 230's "publisher or speaker" element. To the extent that Salesforce might have "published" its own data to Backpage's employees, Salesforce fails Section 230's

---

Congress amended Section 230 to clarify that it "was never intended to provide legal protection to websites that unlawfully promote and facilitate prostitution and contribute to sex trafficking." H.R. Rep. No. 115-572, pt. 1, at 2–5 (Feb. 20, 2018).

third element, which requires that the published content be
"provided by *another* information content provider." 47
U.S.C. § 230(c)(1) (emphasis added).

The judgment of the district court is REVERSED, and this
case is REMANDED for proceedings consistent with this
opinion.

KIRSCH, *Circuit Judge*, dissenting. The majority and I agree that Salesforce lacked constructive knowledge that G.G. had been trafficked on Backpage.com in violation of 18 U.S.C. § 1591. The majority nevertheless concludes that the plaintiffs may hold Salesforce civilly liable under 18 U.S.C. § 1595 as a participant in sex trafficking because Salesforce sold customized software to Backpage when it should have known that Backpage violated § 1591 as to some individual at some point in time, but not necessarily G.G. That broad reading of § 1595 would extend civil liability to nearly every company and individual who did regular and personalized business with Backpage after it faced public allegations of sex trafficking. It also renders meaningless § 1595's requirement that the defendant have constructive knowledge of a § 1591 violation. Because the plaintiffs have not alleged that Salesforce should have known of G.G.'s particular trafficking, they have failed to allege a § 1595 violation. I respectfully dissent.

Section 1595 authorizes victims of sex trafficking to bring damages suits against "the perpetrator [ ]or whoever knowingly benefits … from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." § 1595(a). The "act in violation" here is § 1591, which makes it a crime to knowingly advertise "a person" or to benefit from participation in a venture that does so, "knowing … that means of force, threats of force, fraud, coercion …, or any combination of such means will be used to cause the person to engage in a commercial sex act, or … that [a minor] … will be caused to engage in a commercial sex act." The majority and I agree that to be civilly liable as a participant in a venture that violated § 1591, by the plain language of § 1595, Salesforce must have had constructive knowledge of a § 1591 violation. But to the majority, a

defendant can violate § 1595 so as long as it had "constructive knowledge that a venture *generally* has violated Section 1591." *Ante*, at 22. But there is no such thing as a general violation of § 1591. A violation depends on whether the elements of § 1591 are satisfied (or in this case, whether they are pled).

To plead a § 1595 violation, the plaintiffs must allege that Salesforce had constructive knowledge of G.G.'s trafficking. This is because § 1591's use of the terms "a person" and "the person" is victim-specific, meaning an individual is not guilty of the crime unless the government can prove that his actions were tied to a specific victim. Knowledge of a specific victim (not just general sex trafficking) is an element of § 1591. Thus, because § 1595 requires constructive knowledge of a § 1591 violation and a § 1591 violation requires knowledge of a specific victim, damages suits are available only when a plaintiff plausibly alleges that the defendant should have known that the venture engaged in her particular sex trafficking. See *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 726 (11th Cir. 2021) (defining the elements of a § 1595 claim as "the defendant (1) knowingly benefited (2) from taking part in a common undertaking or enterprise involving risk and potential profit, (3) that the undertaking or enterprise violated the [Trafficking Victims Protection Reauthorization Act] as to the plaintiff, and (4) that the defendant had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA *as to the plaintiff*") (emphasis added). So, for the plaintiffs to bring a civil § 1595 claim against Salesforce, Salesforce must have had constructive knowledge of G.G.'s specific sex trafficking.

By holding that a defendant may be liable under § 1595 even if the plaintiff cannot plead the elements of a § 1591

No. 22-2621                                            45

violation, countless companies and individuals doing business with Backpage in 2008 or later could face liability so long as a plaintiff could allege a defendant's constructive knowledge of Backpage's sex trafficking and a beneficial, tailored relationship that assisted Backpage's growth. But the text of § 1595 does not support that result.

Without constructive knowledge of G.G.'s identity and the trafficking offense committed against her (in other words, a § 1591 violation), the plaintiffs cannot bring a civil § 1595 claim against Salesforce. Because they have not alleged that Salesforce should have had such knowledge (or that Salesforce avoided learning of it), I would hold that the plaintiffs failed to state a claim for relief under § 1595. Thus, I would not reach the issue of whether Salesforce is entitled to dismissal under 47 U.S.C. § 230. I respectfully dissent.